UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| JEFFREY GEORGE SENTER, | ) | C/A No.: 4:12-cv-2502-BHH-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| MARILYN HATLEY, Personally and as | ) | |
| Mayor of the City of North Myrtle Beach, | ) | |
| DAVID HATLEY, CITY OF NORTH | ) | |
| MYRTLE and MELISSA and | ) | |
| TRACY EDGE, and the NORTH MYRTLE | ) | |
| BEACH AQUATIC FITNESS CENTER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Jeffrey George Senter ("Plaintiff" or "Senter") filed suit in the Court of

Common Pleas of Horry County, South Carolina against "Marilyn Hatley, Personally and as

Mayor of the City of North Myrtle Beach," ("M. Hatley"); David Hatley ("D. Hatley"), City of

North Myrtle Beach, ("NMB"); Melissa Edge ("M. Edge"); Tracy Edge ("T. Edge"); and the

North Myrtle Beach Aquatic Fitness Center, ("Aquatic Center"), bringing seven causes of action

including violation of 42 U.S.C. § 1983 against M. Hatley in her personal and official capacity;

intentional interference with contract against M. Hatley, D. Hatley, M. Edge, and T. Edge;

wrongful termination in violation of public policy against NMB; intentional infliction of

emotional distress against M. Hatley, M. Edge, and T. Edge;[1] violation of Plaintiff's right to

privacy against the Aquatic Center; and assault against M. Edge. Compl., ECF No. 1-1. M.

Hatley, NMB, and the Aquatic Center removed the matter to this court and filed a Motion to

---

[1] Although Plaintiff's Complaint also included a claim of intentional infliction of emotional distress against David Hatley, Plaintiff has released that claim as to D. Hatley. *See* Pl.'s Resp. to D. Hatley's Mot. Summ. J. 2-3, ECF No. 113. Summary judgment in favor of D. Hatley is appropriate as to this cause of action.

Dismiss for Failure to State a Claim. ECF Nos. 1, 4. D. Hatley answered the Complaint. ECF No. 5. M. Edge and T. Edge, appearing pro se, answered and filed counterclaims for "Frivolous Lawsuit/Extortion," slander, libel, and malicious prosecution against Plaintiff. ECF No. 61. Plaintiff replied to the counterclaims. ECF No. 62. The court denied the Motion to Dismiss filed by M. Hatley, NMB, and the Aquatic Center. ECF No. 38. The parties completed discovery, and the court now considers the two pending dispositive motions: Motion for Summary Judgment by M. Hatley and NMB, ECF No. 98; and Motion for Summary Judgment by Defendant David Hatley, ECF No. 97. Plaintiff filed responses in opposition to these Motions (ECF No. 112 responds to City Defendants' Motion; ECF No. 113 responds to D. Hatley's Motion). The City Defendants filed a reply, ECF No. 119, and these Motions are now ripe for consideration. Having considered these briefs, the pleadings and applicable law, the undersigned submits this Report recommending Defendants' Motions, ECF Nos. 97 and 98, be *granted* and the matter ended as to the moving Defendants.[2]

I.      Factual Background

       The following facts are either undisputed or taken in the light most favorable to Plaintiff, to the extent they find support in the record.[3] Plaintiff worked for NMB as a Public Safety Officer from February 11, 1994 until he was terminated in October 2010. *See* ECF No. 112-4 at

---

[2] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g), D.S.C, which provides that "[a]ll pretrial proceedings involving litigation arising out of employment discrimination cases invoking federal statutes which proscribe unfair discrimination in employment" be referred to a United States Magistrate Judge. Because the Motions for Summary Judgment are dispositive, the undersigned enters this Report and Recommendation ("Report") for the district judge's consideration.

[3] *See also* ECF No. 22 (Report on prior dispositive motion; includes detailed recitation of Plaintiff's allegations as set forth in his lengthy Complaint). At this summary judgment stage, however, the court is to consider the facts supported by competent record evidence in the light most favorable to the non-moving party—here, Plaintiff. *See* Fed. R. Civ. P. 56.

58, 75. At all times relevant to Plaintiff's Complaint M. Hatley was the mayor of NMB. D. Hatley is M. Hatley's husband. Plaintiff does not dispute that he had an affair with M. Edge, the wife of T. Edge, a state representative. Pl.'s Dep. 16, ECF No. 98-5. Plaintiff testified that he "probably knew [M. Edge] from 2008 to 2010" and "may have had" a sexual relationship [] less than a year." *Id.* at 25-26. T. Edge testified that he learned of that affair in March 2008. T. Edge Dep. 10, ECF No. 98-7. T. Edge testified that he also learned in March 2008 that M. Edge had been having an affair with D. Hatley. *Id.*

On March 19, 2008, NMB's then-public safety director William Bailey ("Bailey") spoke with Plaintiff and told him that T. Edge had called Bailey and wanted him to ask Plaintiff two questions: whether Plaintiff had ever been in the Edges' residence and, if so, whether it had occurred while Plaintiff was on duty. Pl.'s Dep. 14-15.[4] Around that same time frame, T. Edge went to Plaintiff's home and asked whether Plaintiff was having an affair with Melissa Edge. *Id.* at 17, 24. Plaintiff advised T. Edge that he should direct that question to M. Edge. *Id.* at 17.

Plaintiff testified that D. Hatley had become angry when M. Edge broke off her relationship with D. Hatley and began seeing Plaintiff. Pl. Dep. 22-24. Plaintiff stated D. Hatley had been attempting to turn T. Edge against Plaintiff by telling T. Edge about the affair between

---

[4] In Plaintiff's factual recitation opposing summary judgment, he states that on February 12, 2008, he "reported that he felt he was being harassed to the Director of Public Safety and the Assistant City Manager." Pl.'s Mem. 4 (referencing Defs.' NMB and M. Hatley Mem., excerpts from Pl.'s Dep. 15-16). He further states he met with the Assistant City Manager regarding those allegations on February 25, 2008. Pl.'s Mem. 4 (referencing ECF No. 1, State Court Documents). Plaintiff also references a March 19, 2008 meeting with the Director of Public Safety and that he made a March 20, 2008 report of harassment to the NMB City Attorney. *Id.* (referencing same documents). The referenced deposition pages do not include testimony regarding February 2008 or a harassment claim; at the summary judgment stage, mere allegations in an initial pleading are not sufficient. The court need not comb the voluminous record presented to determine whether any evidence of a February 2008 report exists. Plaintiff does not focus on these facts in arguing against summary judgment. In any event, accepting that such reports took place, the recommendation remains the same.

Plaintiff and M. Edge. *Id.* at 23. The record includes evidence that, on May 6, 2008, M. Edge completed an incident report claiming D. Hatley was harassing her. ECF No. 112-4 at 83-86. M. Edge testified that she had previously had a sexual relationship with D. Hatley and attributed the harassment to her relationship with Plaintiff. M. Edge Dep. 12-13, ECF No. 112-5.

A.  Plaintiff's Comments Regarding the 2009 Barefoot Landing Fires

On April 23, 2009, a fire raged through the NMB area and particularly affected the Barefoot Landing community (sometimes referred to herein as the "Barefoot Fires"). Pl. Dep. 37, 53. Plaintiff was called in at 3:00 a.m. that day to assist in defending against the fires, and he worked approximately 16 hours that day. *Id.* at 37. Several months later, footage from the video-camera in Plaintiff's public safety vehicle ("dashcam") was provided to a local media outlet based on a request made pursuant to the Freedom of Information Act ("FOIA").[5] According to Plaintiff's deposition testimony and a news article submitted,[6] Plaintiff's part of a telephone conversation is captured on the April 23, 2009 recording from the dashcam in Plaintiff's public safety vehicle. *See* Pl.'s Mem. 6 & n.32; Defs.' Mem. 3 & ECF No. 98-5 at 29. The article indicates Plaintiff is heard "criticizing North Myrtle Beach Mayor Marilyn Hatley and Public Safety Director William Bailey for how they handled the evacuation of Barefoot Resort during the April [2009] wildfires." ECF No. 98-5 at 29. In pertinent part, the news article quotes Plaintiff as follows:

---

[5] As discussed in more detail within, the recording came to light in August 2009.

[6] Both parties have submitted an article in which "News 13" includes quotations from Plaintiff taken from the dashcam recording of April 23, 2009. Defs.' Mem. 3 & ECF No. 98-5 at 29 (copy of article including web address of http://www2.scnow.com/news/2009/aug/03/tape_shows_north_myrtle_beach_city_official_critic -ar-350596/); *see also* ECF No. 112-21 at 5 (copy of same article supplied by Plaintiff). Plaintiff and Defendants cite to and quote from the article, and neither questions its authenticity. Accordingly, the court refers to it herein without objection but makes no ruling on whether the article is competent evidence.

4

"Well thing, the thing they should've done, they should've put down voluntary evacuations. In other words, they, they just didn't prepare good enough. That's her job. You know, I know they didn't know it was going to move that fast but the thing is you got half the houses burned down and people lined up, you're responsible. That's your job. You're the mayor. Of course, the sh—'s gonna go down hill why, you know all these people weren't here to start off with," said [Plaintiff], on the tape.
. . .
On the tape, [Plaintiff] can be heard saying, "it puts them in their place. They're always criticizing . . . . They knew that fire was coming and they got, they got caught with their pants down. And, they're gonna have to answer. You're gonna hear a lot more of that sh-t."

ECF No. 98-5 at 29. The article notes that Plaintiff's statements "contradict[ed] previous statements aired on News 13 by Bailey and [M.] Hatley who said they did not know which direction the fire was headed before it jumped into Barefoot." *Id.* The article also indicates M. Hatley "disagrees" with Plaintiff's statement that she and Bailey "'knew the fire was coming.'" *Id.* Defendant M. Hatley is quoted as stating, "'It would make no sense for me, or anyone else as far as the director of public safety or the city manager, or anyone else in this town, to withhold that type of information.'" *Id.* "When News 13 asked Hatley if she is alleging that [Plaintiff] lied on the tape, Hatley replied, 'yes.'" *Id.* Plaintiff did not return a telephone call to News 13 to respond to Hatley's statement. *Id.*

Plaintiff testified he took the call on his personal cell phone and, although he was uncertain to whom he was speaking at the time of that recording, Plaintiff noted he had spoken with his mother, M. Edge, and possibly his children during that day. Pl.'s Dep. 37. Plaintiff acknowledged he was on duty working the fires and was in his police vehicle when he took the call. *Id.* at 37-39. Plaintiff noted that he did not expect that his conversations would be broadcast in the local media and that it had been his intent to have a private conversation with friends and family. *Id.* at 54. He did not intend his friends and family to do anything with the information

5

from that conversation. *Id.* Plaintiff indicated his intent had not been to criticize NMB's handling of the fire. *Id.* at 39.

The dashcam recording of Plaintiff's April 2009 remarks was issued to the media on or around August 3, 2009[7]; Plaintiff was called to Director Bailey's office when the tapes were released. Pl.'s Dep. 46-67. Bailey showed Plaintiff the video and, according to Plaintiff, told Plaintiff he "'wanted [Plaintiff] to see it because that is getting ready to come out on the news and they are not going to be happy.'" *Id.* at 47 (Plaintiff quoting Bailey). Bailey advised Plaintiff that "they were extremely upset" with the recordings. *Id.* Plaintiff testified that, about five or ten minutes before M. Hatley stated to the media that Plaintiff had "lied" on the dashcam tape, NMB Information Officer Nicole Aiello ("Aiello") called and advised him that she "'represent[ed] [NMB]'" and that she had made an official statement to the effect that Plaintiff "'has the right to his opinions. [NMB] may not agree with them, but he has the right.'" Pl.'s Dep. 44 (Plaintiff quoting Aiello's statement to media). Plaintiff testified that he was unsure whether Aiello's statement was provided "verbally" or by way of email to the media. *Id.* Aiello advised Plaintiff that he had a right to go speak to the media, whom he described as being "everywhere" that day. *Id.* at 44. Plaintiff testified that he immediately called Bailey and advised him what Aiello had stated. *Id.* Bailey replied, "'Don't go talk with them, we need to stick together on this issue and be a team.'" Pl.'s Dep. 44 (Plaintiff quoting Bailey).

Upon seeing M. Hatley's statement on television indicating Plaintiff had lied about the Barefoot fires, Plaintiff called Bailey and told him he did not appreciate M. Hatley's comments. Pl.'s Dep. 44. "Nobody calls me a liar. And I am sitting here trying to be a team player with you all and you told me to keep quiet and then that is being said." Pl.'s Dep. 45. Bailey, who was in a

---

[7] The link to the article submitted is dated August 3, 2009. *See also* Pl.'s Compl. ¶ 57.

meeting with M. Hatley and then-City Manager Smithson when Plaintiff called him, responded, "That is bad. I am sorry, I will try to take care of it." *Id.* (Plaintiff quoting Bailey).

In opposing summary judgment, Plaintiff provides a "Written Reprimand" dated August 27, 2009, written on NMB letterhead from Bailey to Plaintiff. *See* ECF No. 112-4. The Reprimand provides as follows:

> On 04/23/09 you [Plaintiff] failed to adhere to Department and/or City Policy in that you:
>
> While being recorded on mobile video, you told a member of the public that your superiors failed to act on information that they had and put the citizens of Barefoot at risk unnecessarily. This statement was false and did harm to the department's reputation. This is considered to be insubordination and violation of city policy.
>
> This is the first time you have violated the policy in this area.
>
> This written reprimand is to advise you that in order to maintain a professional Public Safety service for the community and maintain true departmental integrity, all rules, regulations, and policies of the City of North Myrtle Beach and the Department of Public Safety must be recognized and adhered to.

ECF No. 112-4 at 87.[8]

That same day, Plaintiff also received an "Oral Reprimand" for comments that could have been considered offensive. *See* ECF No. 112-9. The written version of the reprimand indicated that, on August 26, 2009, Plaintiff failed to adhere to Departmental and/or City Policy in that he "[m]ade comments and jokes in the presence of others that would be considered offensive. The jokes did constitute harassment in that they did show a lack of consideration for a

---

[8] The copy of the reprimand provided to the court by Plaintiff is unsigned, so the court is unable to determine that it was issued.

fellow human being." *Id.* at 1. Investigative notes indicate the "level of harassment did not, however, rise to the level of ridicule, threats, or sexual harassment." *Id.* at 2.[9]

Plaintiff received a memorandum dated September 2, 2009, entitled "Suspension and/or Probation." *See* ECF No. 98-5 at 30-31. The document was written by Bailey and summarized Plaintiff's April 23, 2009 recorded comments concerning NMB's response to the Barefoot fires. *Id.* "Your comments, implied and stated, were that the Mayor, Public Safety Director and City Manager were 'caught with their pants down,' and their lack of appropriate action had put the citizens in the Barefoot community at risk unnecessarily." *Id.* at 30. The statements "were incorrect" and have been broadcast, "thereby causing harm to the reputation of the City and the Department of Public Safety." *Id.* The incident "violated City personnel policy regarding the use of a cell phone while operating a City vehicle, made more severe by the fact that you were engaged in an emergency operation with your emergency lights flashing." *Id.* "The incident shows a lack of good judgment and violation of Public Safety policy that borders on insubordination on your part." *Id.* Bailey advised that he was recommending a suspension of two days without pay for Plaintiff's actions. Bailey further recommended that Plaintiff be placed on probation for not more than six months. "In addition, you will be removed from any command responsibility on your shift, and we may reestablish your command responsibility once you have proven yourself through the probationary period." *Id.* The notice further provided that "[a]ny subsequent action, behavior or violations of City policy will be grounds for further personnel action, up to and including termination." *Id.* The document was signed by Plaintiff, his

---

[9] The Oral Reprimand was unrelated to the Barefoot fires and concerned off-color comments made to a fellow officer. Unlike the copy of the Written Reprimand for the April 2009 violation, the copy of the Oral Reprimand provided to the court was signed by a supervisor and the Director of Public Safety.

supervisor [the signature appears to be that of Baldasarre], Major Walt Floyd, Bailey, and then-City Manager Smithson. *Id.* at 30-31.

On September 9, 2009, Senter delivered a memorandum to Defendant M. Hatley, then-City Manager Smithson, City Attorney Chris Noury ("Noury"), and Bailey.[10] ECF No. 98-5 at 32-22. In the memorandum with the subject line "CONDUCT UNBECOMING OF AN OFFICER," Plaintiff offered an apology for his "actions over the last seventeen months in [his] private life, which have deeply affected [his] professional life," calling his actions "totally inexcusable." *Id.* at 32. Plaintiff apologized for having "hurt many people" as a result of his "inappropriate relationship with Mrs. Melissa Edge," noting particularly that he had failed his "city, command staff and officers." *Id.* Plaintiff also noted that his "in-car video tape has caused [NMB] and many [of the memorandum's recipients] undue hardship," and apologized for that. *Id.* Plaintiff continued by noting that many of the comments on the video concerning the Barefoot fires were "taken out of context and had no bearing on the fire, but" he notes he is still accountable for them." *Id.* Plaintiff stated, "I know that we all did everything possible to prevent, stop and extinguish the fire." *Id.* Plaintiff asked M. Hatley to accept his apologies, noting that "personal and professional actions have caused [her] much pain and suffering." *Id.* To former City Manager Smithson, Plaintiff offered apologies, noting Smithson had remained strong during the trying times for NMB and offering respect for Smithson's nonjudgmental understanding of him. *Id.* To City Attorney Noury, Plaintiff apologized that his "actions have caused [Noury] undue stress and you have so much more important issues to deal with than my personal matters." *Id.* Plaintiff offered apologies to then-Director Bailey, stating, "I [Plaintiff] know you [Bailey] have been pressured and threaten[ed] by outside sources involving my actions." *Id.* In

---

[10] As of early 2010, Bailey was replaced as Public Safety Director by Walt Floyd; subsequently, Buddelmeyer became Interim Public Safety Director. Pl.'s Dep. 14.

closing, Plaintiff "ask[ed] for [their] forgiveness for [his] shortcomings . . . [and took] full responsibility for this incident . . . ." *Id.* at 33. Plaintiff also noted, "I know there are other individuals involved in this [] and they will have to do their own soul searching to make things right[.]" *Id.*

Plaintiff was placed on probation from September 4, 2009 to March 4, 2010; he was removed from probationary status on June 16, 2010, effective March 4, 2010. Pl.'s Mem. 8 & nn.27, 50; ECF No. 112-12 (noting Bailey had placed Plaintiff on a "six month probationary period" "due to apparent issues with [Plaintiff's] on-the-job performance.").[11] At that time, his pay status was changed from probationary to full time. ECF No. 112-12.[12]

In a June 1, 2010 evaluation, Plaintiff received a 4.30% increase in pay and "meets" or "exceeds-expectations" marks in all categories. The pay raise was made retroactive to August 10, 2009. ECF No. 112-13.

On August 31, 2010 Plaintiff received an evaluation from Lt. Baldasarre for the time period from August 10, 2009 through August 10, 2010, receiving "meets" or "exceeds-expectations" marks in all categories. ECF No. 112-8.

B.  September 2010 Incident

On September 14, 2010, Plaintiff was on duty and "was at [an NMB] fire station talking to an employee [Brad Infante] and [M. Edge] showed up." Pl.'s Dep. 83-84. Plaintiff knew that Infante had also been involved in a relationship with Defendant M. Edge. *Id.* at 85-86. Plaintiff had previously advised Infante that Plaintiff's mental health counselor was of the opinion that M.

---

[11] In his deposition, Plaintiff testified he was never actually placed on probation and was not removed from supervisory responsibilities. Pl.'s Dep. 65. This potential discrepancy does not impact the undersigned's analysis.

[12] It is not clear from the record presented whether Plaintiff received the two-day-suspension-without-pay that Bailey had recommended.

Edge suffered from borderline personality disorder. *Id.* at 86-87. After a conversation between Plaintiff and Infante had been cut short earlier that evening, Plaintiff stopped by the station to talk with Infante. *Id.* at 84-86. Plaintiff told Infante he was there to chat about "hunting and fishing," and did not want them to talk about M. Edge. *Id.*

At 9:46 p.m. on September 14, 2010, Defendant M. Edge pulled her car into the fire station driveway. Pl.'s Dep. 92-93, ECF No. 98-5 at 34 (Timeline of events of that evening taken from dashcam video).[13] As Defendant M. Edge exited her vehicle, she "appeared angry and stated, 'Oh, I see you all both are talking about me again.'" Pl.'s Dep. 90. Plaintiff then advised her that he was activating the dashcam in the police vehicle he was driving. *Id.*[14] Plaintiff talked with M. Edge for several minutes and tried to de-escalate the situation with her. Pl.'s Dep. 93. Realizing he was not going to be able to defuse the situation, Plaintiff advised M. Edge to contact her husband to pick her up at the fire station. *Id.* at 94. At approximately 9:57 p.m., Plaintiff placed M. Edge in the back of his patrol car and advises her he is calling T. Edge to pick her up. ECF No. 98-5 at 34. Plaintiff contacted his supervisor, Lt. Baldasarre, at 9:59 p.m. and advised him of the situation. *Id.*, Pl.'s Dep. 93. Lt. Baldasarre calls Captain Buddelmeyer at 10:00 pm. Captain Buddelmeyer called the City Manager at 10:05 pm. Lt. Baldasarre proceeded to call the Plaintiff at 10:06 p.m., 10:10 p.m., and 10:16 p.m. *See* ECF No. 112-23 (Call Log

---

[13]The video can be viewed on YouTube. *See* https://www.youtube.com/watch?v=WvCtjKifRMk. No party has challenged the video's authenticity.

[14] Plaintiff testified that he had been ordered by a superior to activate his dashcam any time he was on duty and M. Edge approached him. This standing order was the result of Plaintiff's reporting to Lieutenant Guy Johnson several weeks prior to September 14, 2010, that M. Edge had been "making advances" toward another officer. Pl.'s Dep. 90-92. Plaintiff noted that, even without the order, he would have activated the dashcam as a matter of course. *Id.* at 92 (noting when "out doing official police business and an irate person comes up, you want to do that to protect yourself anyway.").

submitted by Plaintiff), ECF No. 98-3 (portions of phone records submitted by Defendants); ECF No. 112-21 at 17-36 (Grievance Excerpts Call Records for individuals).

At approximately 10:12 p.m., Plaintiff advised M. Edge that he believed she was intoxicated, that he saw her drive her vehicle to the fire station, and that he could not allow her to drive any further. ECF No. 98-5. M. Edge asked Plaintiff to administer a sobriety test, which he refused to do. *Id.* At approximately 10:26 p.m., T. Edge arrived on the scene and drove M. Edge home. *Id.*

During the recording, M. Edge's demeanor can only be described as hostile; she can be heard identifying numerous occasions on which she and Plaintiff allegedly engaged in sexual intercourse while he was on duty. *See id*. at 99, ECF No. 98-8 at 38-39. However, when later asked about these allegations by Sgt. Paul Sheets ("Sheets") in the course of an internal investigation, both Plaintiff and M. Edge denied that they had ever engaged in sexual intercourse while Plaintiff was on duty, in uniform, or on city property. ECF No. 98-8 at 38.[15]

On the morning of September 15, 2010, Plaintiff informed Buddelmeyer that he had recorded the incident, based on a direct order. Pl.'s Dep. 98. Plaintiff remained on his regular supervisory duty until September 22, 2010. *Id.*

On the evening of September 21, 2010, Buddelmeyer telephoned Plaintiff at 9:18 p.m., told him the press was aware of the September 14 video, and instructed Plaintiff to report to his office at 8:00 a.m. on September 22, 2010. Pl.'s Dep. 112;[16] Pl.'s Aff. ¶ 5, ECF No. 112-2.[17]

---

[15] Defendants cite to a portion of Defendant M. Edge's deposition in which she "admitted she had been untruthful with Sheets." Defs.' Mem. 6 n.5. However, to the extent this issue is even relevant to ruling on the pending motions, the court considers all facts in the light most favorable to Plaintiff as the non-movant.

[16] Plaintiff testified that it was highly unusual for Buddelmeyer to telephone him after 5:00 p.m. for any reason. Pl.'s Dep. 112. Plaintiff submits that Buddelmeyer removed Plaintiff from his supervisory duties on September 22, 2010 because of a purported conversation that took place at

When Plaintiff met with Buddelmeyer on September 22, Buddelmeyer informed Plaintiff that "The press knows about the incident video and it was FedEx/Ups to the City's civil attorneys in Columbia, S.C., Gignilliat, Savitz and Bettis." Pl.'s Aff. ¶ 9; *see* Pl.'s Dep. 97. During the meeting the Plaintiff requested to review the video to defend his actions. Plaintiff's request was rejected. Pl.'s Aff. ¶ 10.

On September 22, 2010, NMB, through Steve Thomas received a FOIA request for "any incident report regarding a dispute that took place at the city's Cherry Grove fire station involving Melissa Edge[,]" as well as "any dispatch records regarding that event." ECF No. 4-5 at 10 (ex. to Defs.' Mot. Dismiss). David Wren, a reporter with The Sun News, made this FOIA request, noting it was his "understanding that the incident occurred within the past week." *Id.* On September 27, 2010, Wren also requested a "copy of any police dash-cam video taken during the incident involving Melissa Edge." *Id.*

Plaintiff noted that Buddelmeyer had informed him that M. Hatley, the City Manager, City Council, and elected officials all watched the video of the September 14 event. Pl.'s Dep. 100. Plaintiff was not told when those persons watched the video. *Id.*

---

a dinner between Defendant M. Hatley and City Manager Mahaney and their spouses on the evening of September 21, 2010. *Id.* at 110.  Plaintiff offers no evidence that he knows what was discussed during that dinner; rather, he submits that the timing of his call from Buddelmeyer just after the dinner ended and his being relieved of supervisory duties the following day combine to show these actions took place as a result of that dinner between Defendant M. Hatley and the City Manager. *Id.* at 110.

[17] The court notes that portions of Plaintiff's affidavit contain potentially inadmissible evidence concerning the causal relationship between events. A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). However, the portions of the affidavit relaying Plaintiff's recollection of relevant events themselves appropriately are considered at this time.

During Plaintiff's September 22, 2010 meeting with Buddelmeyer, Buddelmeyer advised that, while the City reviewed the recording of the September 14, 2010 incident, Plaintiff would be placed on administrative duty. During that meeting, Buddelmeyer told Plaintiff that "[t]he administration across the street does not think you handled this situation—I've done everything I can for you, but I've got 2 years before I retire." Pl.'s Dep. 114. In deposition, Plaintiff testified he took Buddelmeyer's "two-years to retirement" comment as meaning Buddelmeyer did what he had to do to protect himself. Pl.'s Dep. 115; *see* Pl.'s Dep. 113-14; ECF No. 112-4 at 59 (short memo from Buddelmeyer to Plaintiff advising he was on administrative duties while the "City is reviewing the recording of the incident.").

On September 22, 2010, based on Sheets's investigative report, Buddelmeyer notified City Manager Mike Mahaney ("Mahaney") that M. Edge's allegations that she and Plaintiff had engaged in sexual intercourse while he was on duty were unsubstantiated. ECF No. 98-8 at 42-47.

On September 27, 2010 Captain Rick Buddelmeyer requested a meeting with the Plaintiff in which he again questioned Plaintiff regarding the video of the incident on September 14, 2010. Buddelmeyer again refused to permit Plaintiff to view the video. Pl.'s Aff. ¶ 15. Plaintiff also had a meeting with both Buddelmeyer and City Manager Mahaney on September 27. They questioned Plaintiff about the video but did not permit Plaintiff to view it. Pl.'s Aff. ¶ 16. M. Hatley's office was situated such that she was able to observe the meeting between Plaintiff, Buddelmeyer, and Mahaney. *See* ECF No. 112-21 at 15 (diagram of office presented at grievance hearing).

Buddelmeyer prepared a memorandum dated September 29, 2010 and addressed to City Manager Mahaney in which he provides his findings of the September 14, 2010 incident. ECF

No. 98-8 at 38-40. Buddelmeyer noted that, despite acknowledging that he continued to have an "emotional relationship" with M. Edge, Plaintiff made no effort on the night of September 14, 2010, to "remove himself from the [] situation" to allow an unbiased person to take over. ECF No. 98-8 at 38. Despite stating on several occasions that M. Edge is intoxicated, Plaintiff failed to administer a field sobriety test, despite M. Edge's requests for one. *Id.* at 39. Buddelmeyer concluded that Plaintiff had exercised poor judgment in failing to remove himself from the situation and that he "exacerbated his poor decision by waiting approximately 13 minutes to notify his supervisor" of the events. *Id.*[18]

In an October 5, 2010 memorandum addressed to City Manager Mahaney, Buddelmeyer recommended that Plaintiff be terminated. ECF No. 98-8 at 54. The short memorandum states in full as follows:

> After reviewing the events of September 14, 2010, as well as Sgt. Senter's employment record with the Department, and after meeting with him to discuss the events of that evening, I believe it is the best interest of the City of North Myrtle Beach that Sgt. Senter's employment be terminated.

*Id.*

In deposition, Buddelmeyer recounted one brief conversation he had with Defendant M. Hatley after September 14, 2010, but prior to the decision to terminate Plaintiff. Buddelmeyer testified as follows:

> Ms. Hatley sat down next to me [Buddelmeyer] at one point and looked at me and said, "You've got a mess. What are you going to do?" And I just looked back at her and I said well – I said, "If this would have been taken care of a long time ago, we wouldn't be here; would we?" That was the extent [of the conversation].

---

[18] The report also notes, but largely discounts, most of Plaintiff's statements made defending his actions. For example, Plaintiff stated during the investigation that M. Edge was not grossly intoxicated and that he had not actually observed her driving. ECF No. 98-8 at 39-40. Plaintiff also indicated his statements to Defendant M. Edge concerning her being intoxicated were made to "shock" M. Edge. *Id.* at 40.

Buddelmeyer Dep. 33, ECF No. 98-9. When asked to explain what he meant by "taken care of a long time ago," Buddelmeyer stated that he believed Plaintiff's "moral character" and "the way he conducted himself did not lend well to being a police officer." *Id.* Buddelmeyer continued that he did not have evidence of Plaintiff's character other than his alleged affair with M. Edge. He explained that his "personal feeling" was that one has "no business being a police officer" if he is going to "cheat on a spouse with another spouse, your veracity is severely compromised[.]" *Id.*

Buddelmeyer indicated Plaintiff violated policy in that he "seriously lacked integrity" and that he was "certainly not a good example for young officers" in the way he acted in his personal life and around the police station. Buddelmeyer Dep. 51. He also called Plaintiff's honesty into question, stating:

> [T]he story - - he told me - - was quite different than what was on the videotape. He left out a lot of key - - points there when he related the story to me. . . . I mean his story to me was that he was an innocent victim. He was just standing there; she showed up and went off on him, you know. . . .[H]e didn't tell me any of this other part. . . . [B]ased upon his short version, you know, he appeared to be a victim. But when you watch the video, you'll find . . . other facts and surrounding circumstances, you know. It sheds a little different light on the situation.

*Id.* at 51-52. Buddelmeyer identified a number of relevant City public safety department policies violated by Plaintiff regarding the September 14 incident. *See* ECF No. 98-9 at 3-37 (NMB Dept. of Public Safety Policy and Procedure Manual). He concluded, noting that Senter had further violated City policy the day after the incident by discussing it with a store owner, failing in general to cooperate with Baldasarre, and violating his oath of office because "he wanted to play psychiatrist instead of police officer that night." Buddelmeyer Dep. 51-53; ECF No. 98-9 at 3-37.

City Manager Mahaney approved Buddelmeyer's recommendation that same day (October 5, 2010). ECF No. 98-8 at 55. In his deposition, Buddelmeyer was asked why he chose termination over some lesser discipline:

> Q. Okay. Based on Mr. Senter's conduct on 9/14/2010, could some other discipline have been administered against him?
> A. Certainly, you could. It wouldn't have been appropriate, but you could.
> Q. And based on your investigation and Mike Mahaney's investigation, what led you to go straight to termination?
> A. Jeff was not an officer that I felt could be honest, be asked questions on the witness stand.
> Q. Okay.
> A. I -- I -- I just don't believe that he is -- I don't want to say capable, but he -- he -- he is not the type of -- he does not have the character for an officer that I would want on my police department.
> Q. Okay.
> A. I do not have confidence in him any longer to do his job.

Buddelmeyer Dep. 55-56.

On the morning of October 5, 2010, Lt. Guy Johnson told Plaintiff he had spoken with Buddelmeyer and that no one at the NMB Department of Public Safety "'wants anything to happen to you.'" Pl.'s Dep. 119; ECF No. 98-8 at 58 (Oct. 12, 2010 Letter from Plaintiff to Grievance Committee, noting he was relieved of duty on October 5, 2010 and terminated on October 6, 2010). That afternoon, Plaintiff met with Buddelmeyer and Lt. Johnson. Buddelmeyer advised Plaintiff that the City Manager wanted him to resign by 5:00 p.m. the following day or he would be terminated. Pl.'s Dep. 119-20. When Plaintiff asked for the reason, Buddelmeyer responded, "I don't know. They across the street just don't think that you handled it right." *Id.* at 120. Plaintiff understood that individuals "across the street" could refer to M. Hatley, City Council, City Manager Mahaney, or some combination thereof. *Id.* at 114. That afternoon, Plaintiff's identification, badge, gun, and keys were taken and another officer drove him home. *Id.* Plaintiff chose to be fired. *See* Compl. ¶¶ 127-28.

On October 12, 2010, Plaintiff submitted a letter to the Employee Grievance Committee beginning the grievance process by asking that he be reinstated to his former position. ECF No.

98-8 at 58. In the event he was not reinstated, he advised he sought an appeal before the employee grievance committee in open session. *Id.*

The letter officially notifying Plaintiff of the reasons for his termination, supplied in satisfaction of the grievance policy, is dated October 28, 2010. Pl.'s Dep. 114; ECF No. 98-5 at 57 (Oct. 28, 2010 Letter from Buddelmeyer to Plaintiff providing official notice of reasons for separation from employment). The letter noted Plaintiff's "poor judgment" by not calling someone else to handle the September 14 incident, his failure to administer a field sobriety test at that time, his "failure to recognize [he] did not handle the situation appropriately." ECF No. 98-5 at 57. Buddelmeyer ended the letter, "After meeting with you to discuss the events of the evening and reviewing your employment record with the Department, I felt it was in the best interest of the City of North Myrtle Beach that your employment be terminated." *Id.*

Following his grievance hearing, Plaintiff was met outside by David Wrenn, a newspaper reporter with *The Sun News*. Wrenn told Plaintiff that local attorney Kenneth Moss ("Moss") had advised him that M. Edge had paid for Plaintiff's membership at the Aquatic Center. Pl.'s Dep. 144. The following day, that story ran in the newspaper. *Id.* Plaintiff is unaware who provided Moss with that knowledge. *Id.*

II.    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). An otherwise properly supported summary judgment motion will not be defeated by the

existence of some factual dispute; however, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* at 248. A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 574, 587 (1986). "The non-moving party [has] the ultimate burden of demonstrating a genuine issue of material fact for trial. Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the non-moving party's case." *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649 (4th Cir. 2002) (internal citations omitted); *see also Othentic Ltd v. Phelan,* 526 F.3d 135, 140 (4th Cir. 2008) ("The nonmoving party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'") (quoting *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985)).

III.    Analysis

Plaintiff alleges violation of 42 U.S.C. § 1983 against M. Hatley; intentional interference with contract against M. Hatley, D. Hatley, M. Edge, and T. Edge; wrongful termination in violation of public policy against NMB; intentional infliction of emotional distress against M. Hatley, M. Edge, and T. Edge; violation of Plaintiff's right to privacy against the Aquatic Center; and assault against Defendant Melissa Edge. *Id.*  All Defendants other than M. Edge and T. Edge have moved for summary judgment. The court considers Plaintiff's causes of action in turn.

A.  § 1983 Claim against M. Hatley Individually

Plaintiff brings a cause of action pursuant to § 1983 against M. Hatley in her individual and official capacities. The claim against her in her official capacity is more properly construed as a § 1983 claim against NMB and will be considered separately. The gist of Plaintiff's § 1983

claim against M. Hatley is that she violated his First Amendment rights by terminating him in retaliation for his role in "actions against her husband and in retaliation for the Plaintiff's truthfulness in the wildfires." Compl. ¶¶ 155-56.[19] In responding to Defendants' Motion, Plaintiff focuses only on retaliation over his comments concerning the Barefoot fires that were captured over the dashcam. *See* Pl.'s Mem. 23-24.[20]

The First Amendment protects freedom of speech, freedom of association, and "the right to be free from retaliation by a public official for the exercise of [those] right[s]." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000). "The Supreme Court in *Connick v. Myers,* 461 U.S. 138 (1983), and *Pickering v. Board of Education,* 391 U.S. 563 (1968), has explained how the rights of public employees to speak as private citizens must be balanced against the interest of the government in ensuring its effective and efficient operation." *Smith v. Gilchrist*, 749 F.3d 302, 308 (4th Cir. 2014).

To prevail on a First Amendment retaliation claim, a plaintiff "must show (1) that []he engaged in protected expression regarding a matter of public concern; (2) that [his] interest in First Amendment expression outweighs [his] employer's interest in efficient operation of the workplace; (3) that []he was deprived of some valuable benefit; and (4) that a causal relationship exists between [his] protected expression on matters of public concern and the loss of the

---

[19] In his § 1983 cause of action against M. Hatley, Plaintiff alleges she "pursued the actions against" him "in retaliation for the Plaintiff's role in the instigation of actions against her husband and in retaliation for the Plaintiff's truthfulness in the wildfires." Compl. ¶ 155. He focuses the cause of action on Plaintiff's termination. *See id.* ¶ 156.

[20] In deposition, Plaintiff also submitted M. Hatley potentially was unhappy with Plaintiff because she believed Plaintiff was involved in having D. Hatley investigated in 2008. Pl.'s Dep. 74. However, Plaintiff conceded he had no witness who could testify to that, and that he believed it to be so because the 2008 investigation took place "during Plaintiff's shift." Defs.' Mem. 2-3 n.1 (citing Pl.'s Dep. 77-78). Plaintiff does not respond to this portion of Defendants' Motion and does not focus on any 2008 events in connection with the § 1983 claim. Accordingly, the court focuses the § 1983 claim on events subsequent to the Barefoot fires.

20

benefit." *Peters v. Jenney*, 327 F.3d 307, 322-23 (4th Cir. 2003) (citing *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 351–52 (4th Cir. 2000); *Huang v. Bd. of Govs. of the Univ. of N.C.,* 902 F.2d 1134, 1140 (4th Cir. 1990)). As the Fourth Circuit Court of Appeals has noted, the "causal relationship" inquiry focuses on whether the adverse action would have been taken against the plaintiff "but for" the protected speech and involves two steps. *Peters*, 327 F.3d at 323 (citing *Hall v. Marion Sch. Dist. No. 2,* 31 F.3d 183, 193 (4th Cir. 1994)). First, the "employee bears the burden of establishing the requisite causation to prove that the protected speech was a motivating factor or played a substantial role in inducing the adverse action." *Peters*, 327 F.3d at 323 (internal quotation omitted). "'If the employee is able to prove such, the second step shifts the burden to the employer to put forward evidence that it would have [taken adverse action] even in the absence of the protected speech.'" *Id.* (quoting *Hall*, 31 F.3d at 193).

As an initial matter, the court notes that Defendants never analyze Plaintiff's claims using this well-established First Amendment retaliation framework. Rather, they argue all claims against M. Hatley, which include the § 1983 retaliation claim and the state-law claims for interference with contract and outrage, should fail because there is "absolutely no admissible evidence that Mayor Hatley caused [Plaintiff's] termination." Defs.' Mem. 10. *see also* Defs.' Reply 2 ("Glaringly absent from the record is evidence that Mayor Hatley actually played a role in the decision to place Senter on probation following the release of the Barefoot fire dashcam video, or in the decision to terminate his employment more than a year later."). *Cf.* Pl.'s Mem. 23 nn.117-18 (citing factors as set forth in *Peters*). The undersigned construes Defendants' argument, then, as challenging only the causation prong of the First Amendment retaliation framework. Accordingly, for purposes of considering Defendants' Motion, then, the court assumes without being required to determine that Plaintiff's conversation concerning the

Barefoot fires was private protected expression concerning a matter of public concern and that his right to make such comments is not otherwise outweighed. Unquestionably, Plaintiff's termination deprived him of a "valuable benefit." *Peters*, 327 F.3d at 322-23.

On Reply, Defendants focus on accepted case law requiring that a successful plaintiff in a § 1983 claim must establish that he was deprived of a constitutional right by a defendant acting under color of state law, and that "it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Hearn v. Lancaster Cnty*., 566 F. App'x 2331, 239 (4th Cir. 2014) (citing *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (affirming grant of summary judgment in § 1983 prisoner claim as to defendant with no involvement in arrest or detention). Although Defendants quote the case correctly, the court notes that, in some circumstances, § 1983 "allows the imposition of liability upon actors more remote than those who actually inflict the ultimate constitutional injury, where their own conduct can be said to have played a significant role in causing that injury." *Cook v. James*, 100 F. App'x 178, 180–81 (4th Cir. 2004). Employing this analysis dovetails with the causation prong of the retaliatory discharge factors set out above. Accordingly, the court considers whether Plaintiff has presented sufficient causal evidence to survive summary judgment.

In arguing he has submitted sufficient evidence to survive summary judgment, Plaintiff argues that the record "contains enough circumstantial evidence that the Defendants' contentions are false." Pl.'s Mem. 20. Beyond that, Plaintiff offers little guidance as to what circumstantial evidence suffices to link M. Hatley's actions to his termination. For example, Plaintiff summarizes his argument that M. Hatley is responsible under § 1983 as follows:

> There was a nexus between the Plaintiff's actions [the 2009 speech concerning the Barefoot fires] and the retaliatory actions of the Mayor and the City against the Plaintiff. At the very least there is a genuine issue of fact as to the actions taken against the Plaintiff. Each of the actions taken against the Plaintiff during his

employment—his suspension and termination—occurred after the publication of a
video to the media.

Pl.'s Mem. 24.

Simply referring to "retaliatory actions of the Mayor and City," without explaining how
he can tie M. Hatley to any of the actions, is fatal to his § 1983 claim against M. Hatley.[21] In
responding to Defendants' Motion, Plaintiff references M. Hatley's comments to media that
Plaintiff was a "liar" in his comments concerning the Barefoot fires, asserting that "caused a
hostile work situation for the Plaintiff." Pl.'s Mem. 6, *see also id.* at 7.[22] It is not disputed that M.
Hatley made that comment. Certainly, that M. Hatley made such comments could have made
Plaintiff feel uncomfortable; however, that is not the issue here. Plaintiff must establish that M.
Hatley took retaliatory actions based on Plaintiff's comments.

Plaintiff notes he was disciplined for his actions related to the Barefoot fire comments.
Pl.'s Mem. at 7-8. However, he does not explain how M. Hatley was the one to make the
decision to discipline him or to cause that decision to be made. He notes that the discipline he
received was given by Bailey (not M. Hatley). *Id.* at 8. The news article concerning Plaintiff's
comments headlined that he was criticizing both M. Hatley and Bailey. ECF No. 98-5 at 29.

Plaintiff testified that he had been advised by NMB's public relations person that he had
the right to speak to the media, but that Bailey told him, "'Don't go talk with them, we need to
stick together on this issue and be a team.'" Pl.'s Dep. 44 (Plaintiff quoting Bailey). Plaintiff did
not speak with the media, but upon hearing what M. Hatley said about him, he again contacted
Bailey. At that time, Bailey was in a meeting with M. Hatley and the City Manager and told
Plaintiff he would "try to take care of it." Pl.'s Dep. 44-45. Plaintiff has offered no evidence that

---

[21] The § 1983 claim against NMB is discussed below.
[22] Plaintiff's Complaint contains nothing resembling a claim of hostile work environment.

he was aware of what M. Hatley said in that meeting, nor has he provided other information that M. Hatley was in any manner involved with the decision to discipline Plaintiff for making the comments. The innuendo Plaintiff apparently seeks to have made does not suffice to provide any evidence that M. Hatley was involved in the disciplinary decisions or in some manner "caused" the discipline to take place. In fact it was Bailey who disciplined Plaintiff. According to the media, Plaintiff's comments were also critical of Bailey.

Regarding the incident with M. Edge in September 2010 that resulted in Plaintiff's suspension and termination, Plaintiff provides nothing to tie M. Hatley to the personnel actions taken. In an attempt to do so, Plaintiff suggests that, during a dinner between M. Hatley, the City Manager, and their spouses, M. Hatley pressured the City Manager, who in turn pressured Buddelmeyer to terminate Plaintiff. *See* Pl.'s Dep. 58-59. However, Plaintiff can do no more than suggest this may have happened. He has no witness or other evidence to testify as to what was discussed at that dinner. Pl.'s Dep. 112. Rather, Plaintiff submits that because this dinner took place the evening before he was assigned to administrative duties, and because Buddelmeyer uncharacteristically called Plaintiff at 9:30 p.m. just after that dinner ended to tell him to report to the office the following morning, provides evidence of M. Hatley's involvement with the termination decision. *Id*. at 58-59. The phone records Plaintiff presented during his grievance hearing do nothing to bolster his theory. Plaintiff theorizes that, just after the dinner, the City Manager would have telephoned Buddelmeyer who, in turn, would call Plaintiff. *See* Pl.'s Dep. 112; ECF No. 98-3 (phone records). Interestingly, though, these records indicate the last call between City Manager and Buddelmeyer on that date was at 4:02 p.m., well before the 6:00 p.m. dinner. This type of argument building one inference on top of another is simply not sufficient to show even a circumstantial case that M. Hatley caused or was involved with the

24

decision to terminate Plaintiff. Rather, the only evidence of record is that Buddelmeyer testified that he reached his decision to recommend Senter's termination of his own volition.

Similarly unhelpful to Plaintiff is the notation that M. Hatley "observe[d] the entire meeting" between Plaintiff, City Manager, and Buddelmeyer on September 27, 2010. Pl.'s Mem. 12. That Plaintiff met with City Manager and Buddelmeyer in a conference room near M. Hatley's office in the NMB City Hall does nothing to bolster Plaintiff's attempted circumstantial case.

In considering the evidence presented by Plaintiff in an attempt to present a circumstantial case for M. Hatley's involvement in/cause of Plaintiff's discipline and eventual termination, the court has considered relevant case law, including several cases from the Fourth Circuit Court of Appeals that have found there to have been evidence sufficient to overcome summary judgment motions. In those cases, there was at least some admissible evidence that the named defendant herself was involved in the relevant employment decisions.

For example, in *Peters v. Jenney*, the Fourth Circuit reversed the grant of summary judgment as to the § 1983 retaliation claim, noting there was sufficient evidence to create a dispute of fact as to whether one of the named defendants, Jenney, considered the plaintiff's protected speech, in combination with Jenney's own complaints directed to plaintiff, and to find the speech was the but-for cause of the plaintiff's termination, despite the defendants' proffer of performance-related reasons for the termination. 327 F.3d at 323. In that case, though, it was Jenney who had actually recommended the plaintiff's termination. *Id.* In *Love-Lane v. Martin*, the Fourth Circuit determined there were sufficient causal facts in dispute to defeat summary judgment. 355 F.3d 766, 779-82 (4th Cir. 2004). The court recounted evidence it found combined to provide "sufficient circumstantial evidence to establish that her protected speech . . .

was a substantial factor in the decision to" take adverse employment action. *Id.* at 780-81. That evidence related to actions by the plaintiff's direct superior (Blanchfield), who ultimately recommended the adverse action, and by the named defendant school superintendent (Martin), to whom Blanchfield recommended the action against the plaintiff. *Id.* It was not disputed that both Martin and Blanchfield were involved in making decisions relative to the plaintiff's employment. Again, though, the court did not use purely circumstantial evidence to find an issue of fact existed as to an actor for whom there was no direct evidence of personnel decisions affecting the plaintiff.

Here, however, Plaintiff seems to argue that a reasonable jury could find M. Hatley "caused" the actions up to termination with no concrete evidence that she was in any manner involved with personnel decisions. Further, as to Plaintiff's 2010 suspension and eventual termination, the comments about the Barefoot fires took place in April 2009 and were in the media in August 2009—over one year before Plaintiff's October 2010 termination. *See, e.g., White v. Bailey*, No. 0:04-23225-CMC-BM, 2006 WL 2038297, at *6 (D.S.C. July 18, 2006) (granting summary judgment because, *inter alia*, plaintiff had not presented "sufficient facts and evidence to show that her protected speech is what motivated her discharge" when speech occurred nearly a full year prior to her discharge). *Cf. Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (three-to-four month gap between protected activity and adverse action insufficient to show causation in Title VII case); *Hooven-Lewis v. Caldera,* 249 F.3d 259, 278 (4th Cir. 2001) (in Whistleblower Protection Act matter, finding no causal link when there was a six-month gap between the protected activity and the adverse employment action).

It is recommended that summary judgment be granted as to the § 1983 cause of action brought against M. Hatley in her individual capacity.

B.  § 1983 Claim against NMB (M. Hatley in her Official Capacity as NMB Mayor)

Although Plaintiff's Complaint sets out the § 1983 cause of action against M. Hatley only, as she is sued "individually and as mayor of the City of North Myrtle Beach," Defendants have moved for summary judgment as to any § 1983 retaliation claim brought against Defendant NMB. As Defendants properly assert, a local government entity "cannot be held liable under Section 1983 on a *respondeat superior* theory." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("a municipality cannot be held liable solely because it employs a tortfeasor"). Rather, "[a government entity] may be found liable under 42 U.S.C. § 1983 only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Wolf v. Fauquier Cnty. Bd. of Supers.*, 555 F.3d 311, 321 (4th Cir. 2009) (quoting *Monell*, 436 U.S. at 694). "A custom would exist where there are 'persistent and widespread . . . practices of municipal officials [which] [a]lthough not authorized by written law, [are] so permanent and well-settled as to [have] the force of law.'" *Brubaker v. City of Richmond*, 943 F.2d 1363, 1379 (4th Cir. 1991) (quoting *Monell*, 436 U.S. at 691). "A . . . policy would exist where a [government entity]'s lawmakers have passed a law, *Monell*, 436 U.S. at 694, or where a city official takes certain action and is the decisionmaker responsible for establishing final government policy respecting such activity." *Brubaker* at 1380 (citing *Hughes v. Halifax Cnty. Sch. Bd.*, 855 F.2d 183, 185 (4th Cir. 1988)).

In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988), the Court noted several "guiding principles" regarding when a "decision on a single occasion may be enough to establish an unconstitutional municipal policy."

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." [*Pembaur v. Cincinnati*,] 475 U.S. [469] at 480 [1986]. Second, only those municipal officials

27

who have "final policymaking authority" may by their actions subject the government to § 1983 liability. *Id.,* at 483 (plurality opinion). Third, whether a particular official has "final policymaking authority" is a question of *state law. Ibid.* (plurality opinion). Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business. *Id.,* at 482–483, and n.12 (plurality opinion).

485 U.S. at 123.

Here, Defendants first argue the § 1983 claim against NMB fails for the same reasons the claim against M. Hatley individually fails—there is no evidence that she was involved in decisions concerning Plaintiff's employment. As discussed above, the court agrees there is not evidence sufficient to get to a jury that links M. Hatley to actions against Plaintiff.

In addition, the undersigned agrees with Defendants that Plaintiff has proffered no evidence as to a "policy or custom" of the City of NMB that injured Plaintiff, nor has Plaintiff identified any decision made by one with "final policymaking authority," which, in this instance would be the City Council of North Myrtle Beach. Defs.' Mem. 13-16.

In responding to Defendants' Motion, Plaintiff cites some general law regarding imposition of § 1983 liability, some of it focused specifically on cases brought by inmates against defendants associated with prisons. Pl.'s Mem. 21 n.110.[23] Nowhere, though, does he respond to Defendant NMB's argument that Plaintiff has not set out facts by which § 1983 liability could flow to it. It is not the court's duty to comb through the record itself to make Plaintiff's arguments for him. In this matter, the court is well familiar with the facts presented by

---

[23] Plaintiff also references a Seventh Circuit case, "*Sigsworth v. City of Aurora,*" for the proposition that Plaintiff has set forth a First Amendment violation because he "exceeded his normal regular duties" when he "addressed issues of the Fire." *See* Pl.'s Mem. 26-27 (citing "052507 Fed 7 05-4143"). The court is unable to review that case based on the citation provided. In any event, the court's recommended finding discussed above assumes without deciding that Plaintiff had set forth arguably protected "private" speech. Accordingly no further discussion of this point is required.

both parties. The record contains no facts sufficient to demonstrate potential § 1983 liability for Defendant City of North Myrtle Beach. NMB is entitled to summary judgment on the § 1983 claim.

Plaintiff has not presented argument or evidence[24] that any other of his constitutional rights were violated by any Defendant. Summary judgment is appropriate as to the § 1983 cause of action.

C.  Wrongful Termination Claim against NMB

Plaintiff also brings a cause of action against NMB for Wrongful Termination in Violation of Public Policy. Compl. ¶¶ 167-74.

In very limited circumstances, South Carolina recognizes a "public policy exception" to the doctrine of at-will employment. *See Barron v. Labor Finders of S.C.,* 713 S.E.2d 634, 636 (S.C. 2011). As the South Carolina Court of Appeals has explained:

> When there has been a "retaliatory termination of the at-will employee in violation of a clear mandate of public policy" the employee may have a tort cause of action for wrongful termination. 713 S.E.2d at 637. "The primary source of the declaration of the public policy of the state is the General Assembly; the courts assume this prerogative only in the absence of legislative declaration." *Citizens' Bank v. Heyward,* 135 S.C. 190, 133 S.E. 709, 713 (1925); *see Barron,* 393 S.C. at 617, 713 S.E.2d at 638 (stating the determination of what constitutes public policy for purposes of the public policy exception to the at-will employment doctrine is a question of law for the courts to decide). "The public policy exception clearly applies in cases where either (1) the employer requires the employee to violate the law, or (2) the reason for the employee's termination itself is a violation of criminal law." *Barron,* 393 S.C. at 614, 713 S.E.2d at 637; *see Ludwick v. This Minute of Carolina, Inc.,* 287 S.C. 219, 225, 337 S.E.2d 213, 216 (1985) (holding the public policy exception is invoked when an employer requires

---

[24] In responding to summary judgment, Plaintiff mentions his "federally created rights of Free Association and First Amendment Rights." Pl.'s Mem. 20; *see also id.* at 32. Nowhere, though, does he expound on this argument to explain how any Defendant violated his right of Free Association. Accordingly, the court need not consider this argument here. In any event, the undersigned agrees with Defendants that Plaintiff would have no constitutionally protected rights as to an extra-marital affair with M. Edge. *See* Defs.' Reply 3-5 and cases cited therein, ECF No. 119.

29

> an at-will employee, as a condition of retaining employment, to violate the law); *Culler v. Blue Ridge Elec. Co-op., Inc.,* 309 S.C. 243, 246, 422 S.E.2d 91, 93 (1992) (finding employee would have a cause of action for wrongful discharge if he was discharged because he refused to contribute to a political action fund). The *Barron* court found the public policy exception is not limited to these two situations; however, the exception has not yet been extended beyond them. 393 S.C. at 614, 713 S.E.2d at 637.

*McNeil v. S.C. Dep't of Corr.*, 743 S.E.2d 843, 846 (S.C. Ct. App. 2013), *reh'g denied* (June 25, 2013). In *Epps v. Clarendon County*, 405 S.E.2d 386 (S.C. 1991), the court determined the public policy exception would not be applied to a situation in which an employee has another remedy he may seek for his discharge. *Id.* at 387 (noting plaintiff had potential remedy under 42 U.S.C. § 1983 for employer's alleged violation of First Amendment rights).

NMB moves for summary judgment, alleging Plaintiff's claim fails because he has not identified a public policy violated by his termination. Defs.' Mem. 17-18; *see also* Defs.' Reply 9-11. In response, Plaintiff acknowledges he has the burden of establishing his discharge contravened a "clear mandate of public policy." Pl.'s Mem. 28. He argues, though, that there is a jury question as to whether "the employer's discharge violated public policy." Pl.'s Mem. 29 (citing *Garner v. Morrison Knudsen Corp*., 456 S.E.2d 907 (S.C. 1995)).

The court finds that NMB is entitled to summary judgment on this cause of action because Plaintiff has not demonstrated any public policy exception under which he arguably would fall. As recently as January 2015, the South Carolina Supreme Court reiterated the "restraint" employed by the courts in "undertaking the amorphous inquiry of what constitutes public policy." *Taghivand v. Rite Aid Corp.*, No. 2014-000073, __ S.E.2d __, 2015 WL 340779, at *2 (S.C. Jan. 28, 2015) (noting any exception to the at-will employment doctrine "should emanate from the General Assembly, and from [the Supreme Court of South Carolina] only when the legislature has not spoken").

Here, Plaintiff has not articulated a public policy exception applicable to him. Further, as the fact of this litigation demonstrates, Plaintiff has a remedy to pursue pursuant to 42 U.S.C. § 1983. NMB's Motion for Summary Judgment should be granted as to Plaintiff's case of action for Wrongful Termination in Violation of Public Policy.

D.  Plaintiff's Claim for Intentional Interference with Contract (Count II)

Plaintiff brings a cause of action for intentional interference with contract against Defendants M. Hatley, D. Hatley, M. Edge, and T. Edge. Compl. ¶¶ 158-66 (Count II against Hatleys and Edges). The Complaint also includes a separate cause of action for intentional interference with contract against Defendants M. Edge and T. Edge. Compl. ¶¶ 182-90 (Count V, virtually identical cause of action stated against Edge Defendants only). Here, only M. Hatley and D. Hatley have challenged this cause of action on summary judgment.

To establish a viable cause of action for wrongful interference with an existing contractual relationship, Plaintiff must establish the following elements: (1) a contract; (2) knowledge of the contract by Defendants; (3) an intentional procurement of the contract's breach; (4) the absence of justification for the breach; and (5) resulting damages. *See Love v. Gamble*, 448 S.E.2d 876, 882 (S.C. Ct. App. 1994).

M. Hatley argues she is entitled to summary judgment on this cause of action because there is no admissible evidence that she caused Plaintiff's termination. Defs.' Mem. 10. In his response, Plaintiff seems to argue that M. Hatley's actions to "sabotage" Plaintiff's employment with NMB were outside of the scope of her employment and, therefore, are actionable. Pl.'s Mem. 24-25. As discussed at length above, Plaintiff has not presented evidence to show M. Hatley was involved in terminating Plaintiff. Accordingly, to the extent there was a "contract"

between Plaintiff and NMB, Plaintiff has not set forth evidence sufficient to create a jury question as to whether M. Hatley intentionally procured the breach thereof.

D. Hatley filed a separate Motion for Summary Judgment, and argued first that Plaintiff had not presented evidence of a contract of employment between Plaintiff and NMB. Accordingly, he argues, there was no contract with which anyone could interfere. Def. D. Hatley's Mem. 6-7. Plaintiff's brief response to this portion of D. Hatley's Motion states simply that "Plaintiff has set forth the arguments [for] a contract." Pl.'s Resp. D. Hatley 22, ECF No. 113.[25]

The court need not determine in this instance whether any contract of employment existed between Plaintiff and NMB. Even if such a contract existed, Plaintiff has provided no admissible evidence that D. Hatley intentionally procured the breach of it. As discussed in detail above, the record evidence is that Captain Buddelmeyer recommended Plaintiff's termination and the City Manager accepted the recommendation and terminated Plaintiff. *See* ECF No. 98-8 at 38-40 (Buddelmeyer's September 29, 2010 memorandum to City Manager Mahaney reporting findings of investigation); ECF No. 98-8 at 54 (Buddelmeyer's October 5, 2010 memorandum to City Manager Mahaney recommending Plaintiff be terminated). Buddelmeyer testified that he had no conversations with D. Hatley regarding Plaintiff's job performance. Buddelmeyer Dep. 35, ECF No. 97-3.

Plaintiff submits that D. Hatley "with his wife [M. Hatley] intentionally went out of his way to ruin the Plaintiff's employment with the City due to his jealousy over the Plaintiff's relationship with [M. Edge]." Pl.'s Resp. D. Hatley 22. However, Plaintiff has pointed to no

---

[25] Plaintiff devotes much of his response to D. Hatley's Motion to discussing the tort of wrongful termination for violation of public policy, ECF No. 113 at 18-22, a claim brought only against NMB.

evidence to support that conjecture. Plaintiff's unsupported allegations are insufficient to defeat summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A) (noting, *inter alia*, that party asserting a fact is in dispute "must support the assertion" by "citing to particular parts of materials in the record"). The undersigned finds no genuine issues of material fact exists as to D. Hatley's involvement in decisions related to Plaintiff's employment. His Motion for Summary Judgment should be granted.

E.  Intentional Infliction of Emotional Distress (Outrage)

Plaintiff asserts a cause of action against Defendants M. Hatley, M. Edge, and T. Edge for intentional infliction of emotion distress, or "outrage." Pl.'s Compl. ¶¶ 175-81. In his Complaint, Plaintiff alleges Defendants' "behavior was absurd, intentional, reckless and inflicted severe emotional distress," and that the actions were "calculated to do so." *Id.* ¶¶ 176-77. Defendant M. Hatley argues that the conduct complained of by Plaintiff, even when viewed in the light most favorable to him, does not rise to the level necessary to constitute outrage for purposes of his intentional-infliction-of-emotional-distress claim. The undersigned agrees.

To maintain a claim for intentional infliction of emotional distress or outrage, Plaintiff must establish the following:

(1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct;
(2) the conduct was so extreme and outrageous so as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community;
(3) the actions of the defendant caused plaintiff's emotional distress; and
(4) the emotional distress suffered by plaintiff was so severe that no reasonable man could be expected to endure it.

*Hansson v. Scalise Builders of S.C.,* 650 S.E.2d 68, 70 (S.C. 2007) (internal citations and quotations omitted). As explained by the South Carolina Supreme Court in *Hannson*, "the court

plays a significant gatekeeping role in analyzing a defendant's motion for summary judgment[]" in order to prevent claims for intentional infliction of emotional distress from becoming a panacea for wounded feelings rather than reprehensible conduct[.]" 650 S.E. 2d at 72 (internal quotations and citations omitted). The *Hannson* court noted that a plaintiff alleging an emotional distress claim bears a "heightened standard of proof." *Id.*

In the employment context, mere termination or unpleasant conduct by supervisors does not rise to the level of actionable outrage. *See, e.g.*, *Alonso v. McAllister Towing of Charleston, Inc.* 595 F. Supp. 2d 645, 649-50 (D.S.C. 2009) (dismissing as a matter of law plaintiff's claim for intentional infliction of emotional distress because of termination and noting "having one's employment terminated is a stressful experience, but it can hardly be said to be an act so severe that no reasonable person could be expected to endure it.") (internal quotation omitted); *Shipman v. Glenn*, 443 S.E.2d 921, 922–23 (S.C. Ct. App. 1994) (holding supervisor's actions of verbally abusing and threatening an employee with cerebral palsy with the loss of her job, and ridiculing the employee's speech impediment to the extent the employee was physically ill and had to leave work early was insufficient to state a claim for outrage); *Wright v. Sparrow*, 381 S.E.2d 503, 505-06 (S.C. Ct. App. 1989) (finding allegations that supervisor built a case to justify firing the plaintiff by loading her with responsibility while stripping her of authority and by changing the manner of performing certain duties and then accusing her of not following directions insufficient as a matter of law to constitute the tort of outrage); *Corder v. Champion Rd. Mach. Int'l Co.*, 324 S.E.2d 79, 81 (S.C. 1984) (holding plaintiffs' allegation they were fired in retaliation for exercising their legal rights was insufficient as a matter of law to constitute outrage).

In response to M. Hatley's Motion, Plaintiff states only: "The work environment created by the Defendants as is evidenced by the testimony provided by the Plaintiff was extreme and outrageous. To ultimately understand the situation one must examine the facts as a whole and not singularly." Pl.'s Resp. 26.

Having considered the facts and allegations in the light most favorable to Plaintiff, but performing the role of gatekeeper as to Plaintiff's cause of action for intentional infliction of emotional distress, the court finds Plaintiff has not met his burden of establishing a prima facie case of conduct that rises to the level of outrage under South Carolina law. *See Hannson*, 650 S.E. 2d at 72; *see also Johnson v. Dailey*, 437 S.E.2d 613, 615 (S.C. 1995) (noting the court determines, as a matter of law, whether a plaintiff's complained-of conduct was "so extreme and outrageous it exceed[ed] all possible bounds of decency, and [was] regarded as atrocious and utterly intolerable in a civilized society.") (internal citations omitted).

It is undisputed that M. Hatley responded affirmatively when asked by the media whether Plaintiff's comments regarding the Barefoot fires were lies. After careful consideration of all evidence submitted, and based on the heightened standard of scrutiny the court is to employ in considering outrage causes of action at this stage, the undersigned is of the opinion M. Hatley's comments and actions do not rise to the level of conduct from which a jury could find for Plaintiff as to the cause of action for intentional infliction of emotional distress. *See Champion Road Mach.*, 324 S.E.2d at 81 (citing *Hudson v. Zenith Engraving Co., Inc.*, 259 S.E.2d 812, 814 (S.C. 1979) (noting that in South Carolina, a plaintiff can succeed on a claim for intentional infliction of emotional distress only "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."). *See also Moore v. Rural Health*

*Servs., Inc.*, 1:04-376-RBH, 2007 WL 666796, at *17 (D.S.C. Feb. 27, 2007) (finding no outrage claim when plaintiff was accused of being a racist by employer's board members, was threatened with termination and escorted from his workplace by a sheriff's deputy while a board member yelled down the hallway that the plaintiff was a thief "is not sufficient (even assumed to be true for purposes of summary judgment) to meet the high standard for establishing Plaintiff's outrage claim under South Carolina law."); *Gattison v. S.C. St. Coll.*, 456 S.E.2d 414, 418-19 (S.C. Ct. App. 1995) (finding internal auditor who faced a hostile environment that destroyed his career after he made numerous internal and external reports of irregularities resulting in an investigation by the Commission on Higher Education proved only "unprofessional, inappropriate behavior" but "f[e]ll short of [showing] conduct that exceeds all possible bounds of decency and is atrocious and utterly intolerable in a civilized society").

F.  Plaintiff's Claim against Aquatic Center for Violation of Right to Privacy

Plaintiff also brings a cause of action against Defendant North Myrtle Beach Aquatic Center ("Aquatic Center") for violating his "Right to Privacy" by "publish[ing] personal information regarding the Plaintiff" and his account "in order to damage" him. Compl. ¶¶ 191-97. In moving for summary judgment as to claims against M. Hatley and NMB, those Defendants also move for summary judgment as to Plaintiff's invasion of privacy claim as one brought against the City. Defs.' Mem. 18-20. It is not disputed that M. Edge paid the Aquatic Center membership dues for Plaintiff and his family after Plaintiff had been terminated, nor is it disputed that the Sun News published this information. *See* Pl.'s Dep. 142-43.

NMB acknowledges the Aquatic Center is a department of NMB, *id.* at 18 (quoting Pl.'s Dep. 140-41), and argues Plaintiff's common-law privacy claim fails as a matter of law because Plaintiff has adduced no proof that any agent of NMB published the information. To establish a

cause of action for the publicizing of private affairs as to which the public has no legitimate concern, a plaintiff must demonstrate the following elements: "(1) publicizing, (2) absent any waiver or privilege, (3) private matters in which the public has no legitimate concern, (4) so as to bring shame or humiliation to a person of ordinary sensibilities." *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 514 S.E.2d 126, 132 (S.C. 1999); *id.* at 131 (noting the difference between publicity and publication "is one of a communication that reaches, or is sure to reach, the public"). *See* Pl.'s Mem. 32 n.142 (acknowledging this is the "subpart" of the invasion-of-privacy tort alleged).

The undersigned agrees with NMB/Aquatic Center that it is entitled to summary judgment as Plaintiff has no evidence other than his own unsubstantiated conjecture that anyone affiliated with NMB publicized the information at issue. In his deposition, Plaintiff concedes he is unaware who released the information regarding payment to the media, although he has his "opinions on probably what happened, a girl, man, sitting there at the desk probably thought— just sitting around the work table and said, 'Melissa Edge just did that', and some people heard it, whoever it was and just ---." Pl.'s Dep. 143-45. Plaintiff testified that, on the day of his grievance hearing, a news reporter advised that Attorney Moss gave the media the information that M. Edge had paid Plaintiff's Aquatic Center dues. Pl.'s Dep. 144. Plaintiff indicated he had tried to learn from Attorney Moss how he gained the information, but Attorney Moss did not get back with him. *Id.* at 141-42.

In response, Plaintiff cites general law as to invasion of privacy actions and generally argues the information concerning the dues was not of public concern and that the Aquatic Center published the information. Pl.'s Mem. 31-32. According to Plaintiff, this "violat[ed] the Plaintiff's right to privacy under the section element of privacy rights[,]" and means a "genuine

issue of material fact exists as to the invasion of privacy claim." *Id.* at 32. Plaintiff offers no analysis, nor does he respond to NMB's cogent argument that Plaintiff has been unable to provide any evidence that anyone associated with NMB/Aquatic Center publicized the information.

NMB is entitled to summary judgment as Plaintiff has presented no facts—in dispute or otherwise—that anyone associated with the City disclosed the information to the general public at large, by way of *The Sun News* or otherwise. *Cf. Snavely v. AMISUB of S.C., Inc.*, 665 S.E.2d 222, 227 (S.C. Ct. App. 2008) (affirming trial court's grant of summary judgment; "Consequently, Snavely cannot satisfy the publicity requirement of her invasion of privacy claim because Snavely cannot prove [Defendant] publicized her medical condition to the public at large."). That information regarding the payment of the dues eventually became known requires no different result. *See Swinton Creek*, 514 S.E.2d at 132 (no "sparking the flame" liability because publication to one person is not publicity even if that person later publishes the information to the public at large).

Plaintiff's privacy cause of action should also be dismissed as a matter of law.

IV.    Conclusion

For the reasons set forth above, the undersigned recommends the motions for summary judgment of Defendants Marilyn Hatley and the City of North Myrtle Beach (to include the North Myrtle Beach Aquatic Fitness Center), ECF No. 98, and of Defendant David Hatley, ECF No. 97, be *granted* and the case ended as to these Defendants.

Defendants Melissa Edge and Tracy Edge have filed no dispositive motions, so Plaintiff's claims against them remain, as do their counterclaims brought against Plaintiff. *See* Compl., ECF No. 1; Edge Defs.' Answer and Countercls., ECF No. 61. Subsequent to the United States

District Judge's ruling on this Report and Recommendation, further scheduling information will be provided.

IT IS SO RECOMMENDED.

March 9, 2015                                                        Kaymani D. West
Florence, South Carolina                                      United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**